1

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**
                       **FOR THE DISTRICT OF OREGON**
7                          **PORTLAND DIVISION**

8    DAVID EISENMAN,                    )
                                        )
9              Plaintiff,               )     No. 03:10-cv-00774-HU
                                        )
10   vs.                                )
                                        )   **MEMORANDUM OPINION AND ORDER**
11   NATIONAL ASSOCIATES, INC., NW,     )      **ON DEFENDANT'S MOTION**
     a foreign corporation,             )        **FOR SUMMARY JUDGMENT**
12                                      )
               Defendant.              )
13
                    _____
14

15

16   Alex Golubitsky
     CASE DUSTERHOFF LLP
17   9800 SW Beaverton-Hillsdale Hwy
     Suite 200
     Beaverton, OR 97005
18
         Attorney for Plaintiff
19

20

21   Tanith L. Balaban
     Christopher E. Hawk
22   GORDON & REES LLP
     121 SW Morrison Street
23   Suite 1575
     Portland, OR 97204
24
         Attorneys for Defendant
25

26

27

28

1 - 10-774 MEMORANDUM OPINION AND ORDER

HUBEL, United States Magistrate Judge:

The plaintiff David Eisenman brings this action against his former employer, the defendant National Associates, Inc., NW ("National"), asserting claims for wrongful termination, and intentional infliction of emotional distress ("IIED"). Eisenman filed the case in Multnomah County Circuit Court, and National removed the case to this court on July 6, 2010, on the basis of diversity jurisdiction. *See* Dkt. #1. Eisenman subsequently was granted leave to amend his complaint, and his Second Amended Complaint was filed December 30, 2010. Dkt. #16. The parties have consented to jurisdiction and the entry of final judgment by a United States Magistrate Judge, in accordance with Federal Rule of Civil Procedure 73(b). Dkt. #9.

The matter before the court is National's motion for summary judgment. Dkt. #20. The motion is supported by a brief, Dkt. #21, and the Declaration of Christopher E. Hawk ("Hawk Decl."), Dkt. #22. Eisenman has responded to the motion, Dkt. #26, and his response is supported by the Declaration of Alex Golubitsky ("Golubitsky Decl."), Dkt. #26-1. National has filed a reply, Dkt. #27, supported by a second Declaration of Christopher E. Hawk, Dkt. #28. The motion came on for oral argument on June 8, 2011. The court has considered the parties' briefs and declarations, and the oral arguments of counsel, and for the reasons discussed below, the motion is **granted in part and denied in part**.

## BACKGROUND FACTS

There are few undisputed facts. National, a subsidiary of National Investment Managers, Inc., describes itself as "a

2 - 10-774 MEMORANDUM OPINION AND ORDER

consulting, design, and administration firm for retirement plans such as pensions, 401(k) programs, and profit sharing plans for the Pacific Northwest business community." Dkt. #21, p. 2. Eisenman first began his employment with National on February 1, 1980. He left the company on April 19, 1985, and then returned to work for the company on November 8, 1989, as an Analyst in the company's Seattle, Washington, office. He transferred to the company's Beaverton, Oregon, office in December 1991. *See* Dkt. #22, Hawks Decl. 1, Ex. 2.

The parties' difficulties began sometime in late 2009 and early 2010, when National underwent a management change. It is at this point that the parties' versions of the facts diverge, at least with regard to Eisenman's wrongful termination claim. National claims it always had in place certain policies and procedures governing its employees and their conduct, but prior to the management change, those policies and procedures had been enforced very loosely at the Beaverton office where Eisenman worked. With the management change came "some changes to policies and procedures, but more importantly a decision to enforce the policies and procedures the Beaverton office had been ignoring." Dkt. #21, p. 3. National claims Eisenman resisted the changes, causing "friction and unhappiness with his coworkers, within the office, and with his immediate supervisor." *Id.*, p. 4.

According to National, despite its efforts to work with Eisenman "on his poor performance," he continued to be insubordinate and to act inappropriately, including causing an employee to cry, causing staff to structure their work so they did not have to work with him, causing other analysts to complain about his work,

3 - 10-774 MEMORANDUM OPINION AND ORDER

1   and changing other analysts' work without justification. *Id.*
2   National has submitted a declaration of Gail Whitcomb, a co-worker
3   of Eisenman's for eight years, in which Whitcomb describes
4   Eisenman's resistance to change in the organization and ongoing
5   failure to comply with new procedures. Whitcomb states Eisenman
6   was so abrasive to other staff members that "one employee was
7   brought to tears by him," and after the employee became pregnant,
8   "people in the office were so concerned about the amount of stress
9   [Eisenman] was causing her that a workaround was created so her
10  interactions with [him] would be limited." Whitcomb Declr., Dkt.
11  #22, Es. 4, p. 2.

12      National cites the following as an example of its claim that
13  Eisenman failed to comply with the company's policies and
14  procedures. According to National, Eisenman violated the company's
15  policy requiring him to call his supervisor if he was sick and
16  would be absent from work. National claims Eisenman was
17  reprimanded for failing to follow the policy, and he "apologized
18  and said that he would comply with the policy in the future." *Id.*,
19  pp. 4-5. Nevertheless, National claims, Eisenman "violated the
20  same policy again" a week later. *Id.*, p. 5.

21      National further claims Eisenman "displayed the same obstinate
22  tendencies when National Associates requested a reasonable defer-
23  ment of his jury duty based on a lack of manpower - he threw up
24  roadblocks, lied to his employer about whether he had received a
25  response from the Court, and brought up issues that had nothing to
26  do with National Associates' request." *Id.*, p. 4.

27      National asserts it "determined that after nine months of
28  counseling [Eisenman] on his performance that he was unwilling to

1   work within the new structure of National Associates and it
2   terminated his employment on May 13, 2010." *Id.*

3       Virtually every one of National's factual assertions is
4   vigorously disputed by Eisenman. He contends there were no per-
5   formance issues with his work prior to his termination, and the
6   only person who complained about his work was Debbie Smith, who,
7   along with Martin Smith, "came in to start running the company."
8   Dkt. No. 26, pp. 1-3; *see* Dkt. #26-1, Golubitsky Decl., Ex. 2.[*]
9   The record indicates Debbie Smith testified in her deposition that
10  Eisenman "seemed to understand the business, he seemed to have a
11  strong rapport with his clients, to have a genuine desire to do a
12  good job and to be responsive to his clients' needs," and to the
13  best of her knowledge, "he did his work well." Smith Depo., Dkt.
14  #22, Ex. 3, pp. 13-14. Eisenman has submitted excerpts from the
15  depositions of co-workers Steve Resnikoff and Cindy Chance who
16  testified the quality of Eisenman's work was excellent, and he got
17  along well with co-workers. *See* Dkt. #26-1, Exs. 1 & 2.

18      Concerning the contention that he failed to follow company
19  policy regarding notification of illness, Eisenman claims he
20  complied with his understanding of the policy and his long-term
21  procedure, which was calling in and telling the receptionist when

22

23  _____
24      [*]The deposition excerpts attached as exhibits to the
    Golubitsky Declaration are extremely difficult to follow. The
25  excerpts apparently are arranged in the order in which the
    respective pages were referenced in the brief, rather than in
26  sequentially-numbered page order. Because the plaintiff's brief
    refers only to the deposition page and line numbers, and not the
27  exhibit page numbers, the court has had to spend an inordinate
    amount of time locating the plaintiff's references. The far better
28  practice would be to submit deposition excerpts with the pages in
    sequential order.

1    he was ill.  He asserts that other employees also followed this

2    procedure, and they found the new policies difficult to understand.

3    Dkt. #26, pp. 2-5.  Eisenman contends National "cannot point to one

4    individual who knew of this policy [that he allegedly violated]

5    including Debbie Smith, as she stated that the policy was, in fact,

6    what [Eisenman] did, only to subsequently state that the policy was

7    something different."  *Id.*, p. 5.

8        National's employee handbook specifies that when an employee

9    will be late to or absent from work, the employee "should notify

10   their supervisor as soon as possible in advance of the anticipated

11   tardiness or absence."  Dkt. #26-1, p. 42.  Eisenman claims the

12   procedure normally followed in the Beaverton office prior to the

13   management change was for employees to call the receptionist if

14   they were sick and would be absent from work.  The evidence of

15   record indicates that on April 30, 2010, he called the receptionist

16   to report that he was ill and would not be at work that day.

17   Debbie Smith later called him at home, noting that neither she nor

18   Eisenman's supervisor had received a phone call from Eisenman

19   regarding his absence.  Smith noted employees had been advised of

20   the new policy which was to notify the supervisor "no later than

21   one hour after [the employee's] regular starting time and on each

22   subsequent day of illness[.]"  Dkt. #22, Ex. 18, p. 2.

23       Eisenman sent Smith an email on May 2, 2010, apologizing for

24   not following the new procedure.  He stated it was the first time

25   he had called in sick since the new procedure was implemented, and

26   he did not have a copy of the procedure at home.  When he called

27   the receptionist, she had indicated she would "take care of

28   notifying the appropriate parties."  *Id.*, Ex. 10, p. 1 (email from

6 - 10-774 MEMORANDUM OPINION AND ORDER

1   Eisenman to Smith).  He further stated, "In the future, I will
2   follow the calling-in procedure exactly." *Id.*, p. 2.  On May 10,
3   2010, Eisenman sent an email to his supervisor, Smith, and all
4   personnel at the Beaverton office, stating he had a doctor's
5   appointment at 2:30 and would "be back in the office afterwards if
6   it [didn't] last too long." *Id.*, Ex. 11.  Eisenman testified he
7   believed he had followed the procedure correctly by notifying
8   everyone in advance of his absence for the doctor's appointment.
9   Dkt. #26-1, Eisenman Depo., p. 169.  National continues to assert
10  Eisenman failed to follow the correct procedure even after being
11  warned. *See* Dkt. #22, Ex. 11 (handwritten note on Eisenman's email
12  regarding the doctor's appointment stating, "Did not follow
13  procedure again after warning on 4/30/10.").

14      The circumstances surrounding the events that occurred after
15  Eisenman received a jury summons also are disputed.  On March 24,
16  2010, a jury summons was issued to Eisenman from the Multnomah
17  County Circuit Court, directing him to report for jury duty on
18  April 21, 2010. *See* Hawk Decl., Ex. 12.  For a number of reasons,
19  having Eisenman away from his job during that time period was going
20  to prove difficult for National. *See* Dkt. #21, pp. 5-6.  National
21  drafted a letter for Eisenman's signature, addressed to the
22  Multnomah County Court, requesting that Eisenman's jury duty be
23  deferred.  According to National, a draft of the letter was
24  presented to Eisenman, he requested changes to the letter which
25  were made, Eisenman signed the letter, and National sent it to the
26  court to request the deferral. *See* Dkt. #22, Ex. 15.  Eisenman
27  received a postcard from the court excusing him from jury duty.
28  *See id.*, Ex. 16.  National claims that "instead of informing his

7 - 10-774 MEMORANDUM OPINION AND ORDER

1   employer that his jury service had been deferred, [Eisenman]

2   contacted the Multnomah County Court and said that he would like to

3   serve despite the Court's excusal." Dkt. #21, p. 6.   National

4   further claims that when Eisenman was asked if he had heard from

5   the court regarding his jury status, Eisenman lied and said he had

6   not had any contact from the court. *Id.* National asserts it only

7   learned that Eisenman had lied during discovery in this case, and

8   if it had discovered the lie earlier, "it would have been grounds

9   for immediate termination." *Id.*

10      Eisenman testified in his deposition that he did not, in fact,

11  lie to his employer. He claims he contacted the court and

12  explained that he "had misgivings about the letter," and would

13  still like to serve, if possible. Dkt. #26, p. 5. He claims the

14  court responded that he could still serve, and he was "not excused

15  from jury duty." *Id.* He engaged in email correspondence with

16  Debbie Smith about the jury summons, stating he had "followed up"

17  with the court regarding his juror status, and "[t]hey told [him]

18  to report on April 21, 2010 . . . at 8 a.m." and he was "not

19  excused from jury duty." Dkt. #22, Hawk Decl., Ex. 8, p. 7. When

20  Debbie and Martin Smith queried whether the court normally would

21  respond to a deferral request in writing, Eisenman stated, "Maybe

22  something will arrive today or tomorrow. I spoke to the jury room

23  coordinator by phone. In the absence of written notice, I will

24  follow the directions I received from her. I don't want to run

25  afoul of the Court." *Id.*, p. 5. In his deposition, Eisenman

26  explained that he "thought the court was going to send [him]

27  another thing saying - confirming that [his] jury duty was going to

28  happen. That's . . . what [he] meant about 'Maybe something will

8 - 10-774 MEMORANDUM OPINION AND ORDER

1  arrive today or tomorrow.'"    Dkt. #26, p. 5 (quoting Eisenman
2  Depo., pp. 123-24).    National argues Eisenman's "reasoning is
3  tortured."    Dkt. #27, p. 3.

4      Eisenman asserts that National omitted key facts in its
5  statement of the case in its motion.    National indicated Eisenman
6  was "not working out" in his position as a Client Service
7  Consultant, so "he was laterally moved back to a Senior Analyst
8  position where National Associates felt [he] would be better suited
9  to his skill-set and strengths and would no longer be in a position
10 to make coworkers cry or work around him."    Dkt. #21, p. 5.
11 Eisenman claims National omitted the fact that he "was never given
12 a caseload in this new position, and therefore could not have
13 performed satisfactorily in this role, as he never had files to
14 work on."    Dkt. #26, p. 6.    Thus, Eisenman claims, National "set
15 [him] up for failure in his work responsibilities by not giving him
16 any work responsibilities."    *Id.*    National replies that these facts
17 are irrelevant and immaterial because Eisenman was terminated "for
18 insubordination, not for his workload."    Dkt. #27, p. 3.    Eisenman
19 asserts that a "genuine issue of material fact exists as to whether
20 [he] was in fact insubordinate."    Dkt. #26, p. 7.    He claims that
21 rather than being terminated for insubordination, he was terminated
22 "as a result of [his] refusal to lie to avoid jury duty."    Dkt.
23 #16, Second Amended Complaint, ¶ 12.

24     Many of the facts surrounding Eisenman's IIED claim also are
25 disputed.    Eisenman alleges that on approximately October 13, 2009,
26 he was confronted by his former supervisor, Lynn Wakem, "about a
27 rumor that Lynn Wakem was engaging in an extra-marital affair with
28 a subordinate."    *Id.*, ¶ 20.    Wakem apparently believed that

9 - 10-774 MEMORANDUM OPINION AND ORDER

Eisenman and two other employees were spreading the rumor. Dkt. #21, p. 7. During the confrontation, Wakem "leaned over [Eisenman's] desk and threatened [him] with termination for spreading these rumors." Dkt. #21, p. 7. Eisenman specifically claims Wakem threatened to fire him "if these rumors were shared with Debbie and Martin Smith, Director of Operations and President, respectively, of [National.]" Dkt. #16, ¶ 21. Eisenman further alleges that at the time of the confrontation, Wakem was aware "that Debbie and Martin Smith were going to be conducting interviews with employees in [National's] office regarding Mr. Wakem and these rumors the following day." *Id.* Eisenman claims Wakem intended to cause him severe emotional distress "in order to intimidate [him] from disclosing the existence of these rumors," and the intimidation caused him to "suffer[] from stress-related anxiety, heightened blood pressure, gastrointestinal problems, fear of returning to work and insomnia." *Id.*, ¶¶ 22-23.

National notes there was no physical contact between Wakem and Eisenman during the confrontation, and Eisenman acknowledged in his deposition that National did not direct Wakem to confront Eisenman or to threaten him. Dkt. #21, p. 7. National contends that immediately upon learning of the confrontation, it informed Eisenman and the other two employees "that their jobs were not in jeopardy, conducted a thorough investigation of the matter, and removed Mr. Wakem from any supervisory authority over [Eisenman] and the other two employees." *Id.* National claims that although Wakem quit his job on February 20, 2010, Eisenman "continued to complain about Mr. Wakem up until the day of his termination." *Id.*

10 - 10-774 MEMORANDUM OPINION AND ORDER

1    National argues Wakem was not acting within the scope of his

2    employment at the time of the confrontation, and Eisenman has

3    presented no evidence that would allow a jury to find National

4    vicariously liable for Wakem's conduct.  Eisenman argues the jury,

5    and not the court, should determine whether Wakem was acting within

6    the scope of his employment at the time of the confrontation.

7

8                       *SUMMARY JUDGMENT STANDARDS*

9    Summary judgment should be granted "if the movant shows that

10   there is no genuine dispute as to any material fact and the movant

11   is entitled to judgment as a matter of law."  Fed. R. Civ. P.

12   56(c)(2).  In considering a motion for summary judgment, the court

13   "must not weigh the evidence or determine the truth of the matter

14   but only determine whether there is a genuine issue for trial."

15   *Playboy Enters., Inc. v. Welles*, 279 F.3d 796, 800 (9th Cir. 2002)

16   (citing *Abdul-Jabbar v. General Motors Corp.*, 85 F.3d 407, 410 (9th

17   Cir. 1996)).

18   The Ninth Circuit Court of Appeals has described "the shifting

19   burden of proof governing motions for summary judgment" as follows:

20          The moving party initially bears the burden of
            proving the absence of a genuine issue of
21          material fact.  *Celotex Corp. v. Catrett*, 477
            U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d
22          265 (1986).  Where the non-moving party bears
            the burden of proof at trial, the moving party
23          need only prove that there is an absence of
            evidence to support the non-moving party's
24          case.  *Id.* at 325, 106 S. Ct. 2548.  Where the
            moving party meets that burden, the burden
25          then shifts to the non-moving party to desig-
            nate specific facts demonstrating the exis-
26          tence of genuine issues for trial.  *Id.* at
            324, 106 S. Ct. 2548.  This burden is not a
27          light one.  The non-moving party must show
            more than the mere existence of a scintilla of
28          evidence.  *Anderson v. Liberty Lobby, Inc.*,

> 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed.
> 2d 202 (1986). The non-moving party must do
> more than show there is some "metaphysical
> doubt" as to the material facts at issue.
> *Matsushita Elec. Indus. Co., Ltd. v. Zenith
> Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct.
> 1348, 89 L. Ed. 2d 528 (1986). In fact, the
> non-moving party must come forth with evidence
> from which a jury could reasonably render a
> verdict in the non-moving party's favor.
> *Anderson*, 477 U.S. at 252, 106 S. Ct. 2505. In
> determining whether a jury could reasonably
> render a verdict in the non-moving party's
> favor, all justifiable inferences are to be
> drawn in its favor. *Id.* at 255, 106 S. Ct.
> 2505.

*In re Oracle Corp. Securities Litigation*, 627 F.3d 376, 387 (9th Cir. 2010).

### *DISCUSSION*

### *A. Wrongful Termination Claim*

### *1. Burden of proof*

National argues Eisenman's wrongful discharge claim is subject to the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). *See* Dkt. #21, p. 9. National asserts that "wrongful discharge claims are a type of retaliation claim, are subject to the *McDonnell Douglas* burden-shifting framework, and this framework applies to claims under both state and federal law." Dkt. #27, p. 4. In support of this claim, National cites *Hedum v. Starbucks Corp.*, 546 F. Supp. 2d 1017 (D. Or. 2008) (Mosman, J.), and *Williams v. Federal Express Corp.*, 211 F. Supp. 2d 1257, 1265-66 (D. Or. 2002) (Jones, J.). The issue is not as clear as National suggests.

*McDonnell Douglas* expressly applies to "the order and allocation of proof in a private, non-class action **challenging employment discrimination**." *Id.*, 411 U.S. at 800, 93 S. Ct. at

12 - 10-774 MEMORANDUM OPINION AND ORDER

1823 (emphasis added).  In *Hedum*, the plaintiff sued her former
employer "for religious discrimination, retaliation, workers'
compensation discrimination, and wrongful discharge." *Hedum*, 546
F. Supp. 2d at 1018.  Judge Mosman observed that the *McDonnell
Douglas* burden-shifting framework "applies to both federal
**discrimination claims** brought under Title VII and to state law
**discrimination claims** litigated in federal court." *Id.*, 546
F. Supp. 2d at 1022 (emphasis added; citation omitted).  In
discussing the plaintiff's common-law wrongful discharge claim,
Judge Mosman noted, "As with Mr. Hedum's other claims, federal
courts apply the three-part *McDonnell Douglas* burden-shifting
analysis to Oregon wrongful discharge claims." *Id.*, 546 F. Supp.2d
at 1027 (citing *Williams, supra*).  However, the plaintiff's
wrongful discharge claim was "based on her resistance to
Starbucks's allegedly discriminatory practices," and the court
found the plaintiff had "made out a prima facie case that she was
fired in retaliation for her resistance to religious dis-
crimination[.]" *Id.*, 546 F. Supp. 2d at 1028.  The court further
found that Hedum's "Complaint clearly link[ed] her wrongful
discharge claim only to her claims of religious discrimination and
retaliation." *Id.*

Similarly, in *Williams*, the plaintiff's wrongful discharge
claim was based on his claim that he was fired for complaining
about discriminatory treatment. *See Williams*, 211 F. Supp. 2d at
1259.  The plaintiff has cited no cases where the *McDonnell Douglas*
framework has been applied to a common law wrongful discharge claim
that did not involve allegations of discrimination.  However, the
decision as to whether *McDonnell Douglas* applies does not need to

13 - 10-774 MEMORANDUM OPINION AND ORDER

be made at this juncture.  Whether the initial burden is on National to identify "portions of the record on file which demon-strate the absence of any genuine issue of material fact," *Hutton v. Jackson County*, No. 09-3090-CL, slip op., 2010 WL 4906205, at *3 (D. Or. Nov. 23, 2010) (Clarke, MJ), or on Eisenman to make out a *prima facie* case as required by *McDonnell Douglas*, the result here would be the same: National's motion for summary judgment on Eisenman's wrongful discharge claim fails under either analysis.

### 2.  Discussion

Eisenman claims he was terminated "as a result of [his] refusal to lie to avoid jury duty." Dkt. #16, ¶ 12.  He argues termination of an employee for attending jury duty is a violation of Oregon law, which provides, "'An employer shall not discharge or threaten to discharge, intimidate, or coerce any employee by reason of the employee's service or scheduled service as a juror on a grand jury, trial jury or jury of inquest.'"  Dkt. #26, p. 8 (quoting Or. Rev. Stat. § 10.090(1)).

National asserts that under Oregon law, it could discharge Eisenman at any time, for any reason, "unless doing so violate[d] a contractual, statutory, or constitutional requirement."  Dkt. #21, p. 8 (citing *Babick v. Oregon Arena Corp.*, 333 Or. 401, 407, 40 P.3d 1059, 1061-62 (2002), in turn citing *Patton v. J.C. Penney Co.*, 301 Or. 117, 120, 719 P.2d 854, 856 (1986)).  National recognizes that "[t]he tort of wrongful discharge is a narrow exception to this general rule."  *Id.*  Indeed, I previously have observed that the protected societal interest in being able to assemble juries "falls within one of the narrow exceptions the

14 - 10-774 MEMORANDUM OPINION AND ORDER

Oregon Supreme Court has identified to at-will employment in Oregon: termination for fulfilling societal obligations." *Halbasch v. Med-Data, Inc.*, No. CV 98-882, 1999 WL 1080702, at *3 (D. Or. Aug. 4, 1999) (Hubel, MJ). *See Hutton*, 2010 WL 4906205, at *10 ("Oregon recognizes the common-law tort of wrongful discharge as a narrow exception to the at-will employment doctrine.") (citing *Sheets v. Knight*, 308 Or. 220, 230-31 (1989)).

On this record, whether Eisenman was discharged for attending jury duty, as he claims, or for insubordination, as National claims, is a material issue of disputed fact. National complains that Eisenman has failed to "show any causal link between his protected activity and his termination." Dkt. #21, p. 10 (citing *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054 (9th Cir. 2002)). However, "[t]he Ninth Circuit has held that where 'an adverse employment action follows on the heels of protected activity,' causation can be inferred from timing alone." *Williams*, 211 F. Supp. 2d at 1265 (quoting *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002); and citing *Miller v. Fairchild Indus.*, 885 F.2d 498, 505 (9th Cir. 1989) "(prima facie case of causation was established when discharges occurred forty-two and fifty-nine days after EEOC hearings)").

Eisenman's discharge occurred less than a month after his jury service. Considering the facts in the light most favorable to Eisenman, as the nonmoving party, the court finds he has alleged a causal link between the protected activity and his termination. Further, the record is rife with disputed issues of material fact that preclude summary judgment for National on Eisenman's wrongful discharge claim.

1

### *B. IIED Claim*

2    Eisenman asserts two bases for his IIED claim. He claims the

3   incident in which Lynn Wakem threatened him caused him "great

4   stress," resulting in "stress-related anxiety, heightened blood

5   pressure, gastrointestinal problems, fear of returning to work and

6   insomnia[.]" Dkt. #16, ¶ 23.    He further claims he "was

7   additionally distressed" when he was terminated "for participating

8   in jury duty." *Id.*, ¶ 26. National argues Eisenman's IIED claim

9   fails for two reasons; i.e., lack of evidence to support the claim,

10  and because the claim "is barred by the workers' compensation

11  exclusivity provision." Dkt. #21, p. 13.

12    In *Mayorga v. Costco Wholesale Corp.*, the Ninth Circuit Court

13  of Appeals, applying Oregon law, observed:

14          To succeed on a claim for intentional inflic-
            tion of emotional distress, a plaintiff must
15          prove: "(1) the defendant intended to inflict
            severe emotional distress on the plaintiff,
16          (2) the defendant's acts were the cause of the
            plaintiff's severe emotional distress, and (3)
17          the defendant's acts constituted an extra-
            ordinary transgression of the bounds of
18          socially tolerable conduct." *McGanty v.
            Staudenraus*, 321 Or. 532, 901 P.2d 841, 849
19          (1995) (internal quotation marks and citation
            omitted).

20

21  *Mayorga*, 302 Fed. Appx. 748, 749 (9th Cir. 2008); *accord Grimmett*

22  *v. Knife River Corp.-Northwest*, No. CV-10-241, slip op., 2011 WL

23  841149 (D. Or. Mar. 8, 2011) (Hubel, MJ); *see House v. Hicks*, 218

24  Or. App. 348, 357-58, 179 P.3d 730, 736 (2008) (IIED plaintiff must

25  prove that defendant "intended to cause plaintiff severe emotional

26  distress or knew with substantial certainty that their conduct

27  would cause such distress"; that defendant's conduct was "outra-

28  geous . . . *i.e.*, conduct extraordinarily beyond the bounds of

socially tolerable behavior"; and that defendant's "conduct in fact caused plaintiff severe emotional distress") (citing *McGanty v. Staudenraus*, 321 Or. 532, 543, 550, 901 P.2d 841 (1995)).  "'A trial court plays a gatekeeper role in evaluating the viability of an IIED claim by assessing the allegedly tortious conduct to determine whether it goes beyond the farthest reaches of socially tolerable behavior and creates a jury question on liability.'" *Ballard v. Tri-County Metro. Transp. Dist. of Oregon*, No. 09-873, slip op., 2011 WL 1337090 (D. Or. Apr. 7, 2011) (Papak, MJ) (quoting *House*, 218 Or. App. at 358, 179 P.3d at 736; and citing *Pakos v. Clark*, 253 Or. 113, 453 P.2d 682, 691 (1969) "('It was for the trial court to determine, in the first instance, whether the defendants' conduct may reasonably be regarded as so extreme and outrageous as to permit recovery.')").

For conduct to be sufficiently "extreme and outrageous" to support a claim for IIED, the conduct must be "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *House*, 218 Or. App. at 358-60, 179 P.3d at 737-39 (quoting *Restatement (Second) of Torts*, § 46, comment d).  The determination of whether conduct rises to this level "is a fact-specific inquiry, to be considered on a case-by-case basis, based on the totality of the circumstances." *Id.* However, although the inquiry is fact-specific, the question of whether the defendant's conduct exceeded "the farthest reaches of socially tolerable behavior" is, initially, "a question of law." *Houston v. County of Wash.*, 2008 WL 474380, at *15 (D. Or. Feb. 19, 2008) (citation omitted).

The relationship between the parties is important in evaluating the allegedly distressing conduct. For example, "[t]he existence of the employee-employer relationship constitutes a 'special relationship' that may be considered in determining whether the conduct is 'extraordinary[.]'" *Dolman v. Willamette Univ.*, No. CV-00-61, 2001 WL 34043744, at *16 (D. Or. Apr. 18, 2001) (Hubel, MJ) (citing *MacCrone v. Edwards Center, Inc.*, 160 Or. App. 91, 100, 980 P.2d 1156, 1162 (1999)). It is undisputed that Wakem was in a supervisory position over Eisenman at the time the incident occurred. However, the parties disagree as to whether Wakem was acting in the scope of his employment at the time of the confrontation. Even if National were found to be vicariously liable for Wakem's actions, I find the facts alleged would not permit a jury to conclude that Wakem's conduct was sufficiently outrageous to support Eisenman's IIED claim. "Conduct that is merely 'rude, boorish, tyrannical, churlish and mean' does not satisfy the standard, . . . nor do 'insults, harsh or intimidating words, or rude behavior ordinarily . . . result in liability even when intended to cause distress.'" *Watte v. Edgar Maeyens, Jr., M.D., P.C.*, 112 Or. App. 234, 238, 828 P.2d 479, 481 (1992) (quoting *Patton, supra*, and *Hall v. The May Department Stores*, 292 Or. 131, 135, 637 P.2d 126, 129 (1981)).

Although Wakem's behavior may have been distasteful and inappropriate, it was not sufficiently egregious to result in liability. *See, e.g.*, *Pearson v. U.S. Bank Corp.*, No. 04-3026, 2004 WL 1857099 (D. Or. Aug. 18, 2004) (presenting plaintiff with toilet in front of other managers and co-workers, falsely accusing plaintiff of dishonesty, and making unfounded accusations against

plaintiff for unsatisfactory work performance held not to "rise to the requisite level of extreme conduct which the courts have found exceeds the bounds of social toleration"); *Clemente v. State*, 227 Or. App. 434, 443, 206 P.3d 249, 255 (2009) (affirming dismissal of IIED claim, noting: "At most, [plaintiff] was subjected to an insensitive, mean-spirited supervisor who might have engaged in gender-based, discriminatory treatment, but . . . that treatment by itself did not amount to '*aggravated* acts of *persecution* that a jury could find beyond all tolerable bounds of civilized behavior.'") (quoting *Hall v. The May Dept. Stores*, 292 Or. 131, 139, 637 P.2d 126, 131 (1981); emphasis in original); *Hetfeld v Bostwick*, 136 Or. App. 305, 901 P.2d 986 (1995) (no claim for IIED where defendant-mother and her new husband engaged in course of conduct designed to cause estrangement of plaintiff-father from his children); *Shay v. Paulson*, 131 Or. App. 270, 884 P.2d 870 (1994) (no claim for IIED where defendant allegedly forged plaintiff's name on magazine order form); *Watte v. Edgar Maeyens, Jr., M.D., P.C.*, 112 Or. App. 234, 828 P.2d 479 (1992) (in the course of terminating plaintiffs, defendant allegedly directed them to hold hands with two co-workers, demanded surrender of their keys, "paced tensely in front of them with clenched hands, accused them of being liars and saboteurs, . . . and rashly ordered them off the premises"; conduct found not to exceed bounds of social toleration).

Eisenman further alleges he "was additionally distressed when [National] terminated [his] employment for participating in jury duty." Dkt. #16, ¶ 26. Even if true, Eisenman has failed to allege a sufficient nexus between his termination "for

19 - 10-774 MEMORANDUM OPINION AND ORDER

participating in jury duty" and his IIED allegation. The record contains no evidence that National intended to inflict severe emotional distress on Eisenman. Eisenman's counsel conceded this point at oral argument, acknowledging that the IIED claim based on National's termination of Eisenman is not "a credible theory."

In any event, Eisenman has failed to show National's action in terminating him was the cause of his severe emotional distress, or that National's actions underlying his termination were sufficiently egregious to sustain an IIED claim. As the court explained in *Madani v. Kendall Ford, Inc.*, 312 Or. 198, 818 P.2d 930 (1991), *abrogated on other grounds by McGanty v. Staudenraus*, 321 Or. 532, 910 P.2d 841 (1995):

> An employee who has been discharged can state a claim for intentional infliction of emotional distress if the employer committed abusive acts in the course of the firing. Here, however, plaintiff does not allege that the method of firing him was anything other than ordinary. He simply complains of the alleged reason why he was discharged. An employee also can recover if the underlying acts preceding the firing were an extraordinary transgression of the bounds of socially tolerable conduct and if those acts caused the severe distress. Again, that is not this case. The pleadings allege that plaintiff was distressed only by being fired.

*Madani*, 312 Or. at 205-06, 818 P.2d at 934.

"'[T]he tort [of IIED] does not provide recovery for the kind of temporary annoyance or injured feelings that can result from friction and rudeness among people in day-to-day life even when the intentional conduct causing plaintiff's distress otherwise qualifies for liability.'" *Dolman*, 2001 WL 34043744, at *16 (quoting *Hall*, 292 Or. at 135, 637 P.2d at 129)). I conclude that the actions of National and its employees, including Wakem, were

20 - 10-774 MEMORANDUM OPINION AND ORDER

not, as a matter of law, the type of "extraordinary transgression of the bounds of socially tolerable conduct" that would support Eisenman's IIED claim.   Accordingly, National is entitled to summary judgment on the IIED claim, and I grant the motion on this claim.  Having so found, I do not need to reach National's argument that Eisenman's IIED claim is precluded by the workers' compensation exclusivity provision.

### *CONCLUSION*

National's motion for summary judgment, Dkt. #20, is **granted in part and denied in part,** as stated above.

IT IS SO ORDERED.

Dated this 17th day of June, 2011.


_____/s/ Dennis James Hubel_____
Dennis James Hubel
Unites States Magistrate Judge